**STARK & STARK, P.C.**
100 American Metro Boulevard
Hamilton, New Jersey 08619
Tel: (609) 896-9060
Fax: (609) 895-7395
Martin P. Schrama, Esq.
Stefanie Colella-Walsh, Esq.
Email: mschrama@stark-stark.com
scolellawalsh@stark-stark.com

**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Floor
New York, New York 10023
Tel: (917) 716-7132
Elena A. Belov, Esq.*
Email: elena@almeidalawgroup.com
**pro hac vice forthcoming*

*Attorneys for Plaintiffs and Putative Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COLLEEN BEAULIEU, Individually on Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BAYADA HOME HEALTH CARE, INC.<br><br>Defendant. | **Document Electronically Filed**<br><br>Civil Action No. 1:26-CV-9283<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Colleen Beaulieu ("Plaintiff"), on behalf of herself and all others similarly situated, through undersigned counsel, brings this class action against Bayada Home Health

Care, Inc. ("Defendant" or "Bayada") and alleges, upon personal knowledge as to her own actions and her counsel's investigation, and upon information and belief as to all other matters, as follows:

## I. NATURE OF THE ACTION

1. Plaintiff brings this class action against Bayada for its failure to adequately secure and safeguard Plaintiff's and other similarly situated current and former Bayada patients' and employees' (collectively defined herein as the "Class" or "Class Members") personally identifiable information ("PII") and protected health information ("PHI"). Upon information and good faith belief, the compromised information includes names, dates of birth, Social Security numbers, financial account information, medical diagnosis and treatment information, health insurance plan information, and prescription information, among other things (collectively, "Private Information").[1]

2. Bayada is a home health care provider that furnishes home health, hospice, personal care, and related in-home services. Bayada operates in six countries and twenty-two U.S. states and served nearly 170,000 people last year.

3. On March 2, 2026, Bayada first became aware of a cybersecurity event affecting its network environment. Bayada engaged third-party forensic specialists, who determined that an unauthorized actor had gained access to certain Bayada systems and copied data between February 18 and March 2, 2026 (the "Data Breach"), essentially remaining undetected in Defendant's systems for almost two weeks.[2]

---

[1] Bayada Home Health Care, Notice of Data Breach (July 17, 2026), https://oag.ca.gov/system/files/Bayada%20-%20Sample%20Notice.pdf (last visited July 21, 2026)

[2] *Id.*

4. Following completion of its data review, on or about July 17, 2026 – or more than four months after first detecting the Data breach – Defendant began sending written notice of the Data Breach by U.S. mail to affected individuals.

5. As a result of the Data Breach, Plaintiff's and Class Members' Private Information was accessed and acquired by unauthorized third parties.

6. Because the Data Breach exposed highly sensitive personal and medical information, Plaintiff and Class Members face a substantial, imminent, and ongoing risk of identity theft, medical identity theft, financial fraud, and other forms of misuse of their Private Information. This risk will likely persist for years, if not for the remainder of their lives.

7. Armed with the Private Information compromised in the Data Breach, cybercriminals who carried out the Data Breach can and will commit a variety of crimes, including obtaining medical services or prescriptions in Class Members' names, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

8. Plaintiff and Class Members have also suffered concrete injuries in fact including, but not limited to, lost or diminished value of Private Information, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, loss of benefit of the bargain, and actual misuse of the compromised data consisting of an increase in spam calls, texts, or emails.

9. Had Defendant properly implemented adequate data security practices, it could have prevented the Data Breach or, at the very least, discovered the Data Breach sooner.

10. Defendant's conduct is especially egregious given that Bayada experienced another data breach last year, when hackers accessed its vendor systems between October and November 2025, exposing the PHI and PII of Defendant's patients.[3]

11. Upon information and good faith belief, despite being on notice of the possibility of another data breach, Defendant did not improve its faulty security practices and Defendant's conduct allowed cybercriminals to gain access to the Private Information that Defendant collected, stored, and maintained in the course of providing healthcare services.

12. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and exfiltrated during the Data Breach.

13. Plaintiff, on behalf of herself and all others similarly situated, therefore brings claims for (i) Negligence; (ii) Breach of Implied Contract; (iii) Breach of Fiduciary Duty; (iv) Invasion of Privacy; and (v) Unjust Enrichment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably necessary and appropriate data security practices to safeguard the Private Information in Bayada's custody in order to prevent incidents like the Data Breach from occurring in the future.

## II. **THE PARTIES**

14. Plaintiff Colleen Beaulieu is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in Del Haven, New Jersey.

---

[3] *See* 2026-01-30 BAYADA Home Health Care Data Breach Notice to Consumers, https://ago.vermont.gov/document/2026-01-30-bayada-home-health-care-data-breach-notice-consumers; *see also* THE HIPAA JOURNAL, *Bayada Home Health Care Affected by Doctor Alliance Data Breach* (Feb. 3, 2026), https://www.hipaajournal.com/bayada-home-health-care-doctor-alliance-data-breach/.

15. Defendant Bayada is a Pennsylvania corporation with its principal place of business located at 4300 Haddonfield Road, Pennsauken, New Jersey, 08109. Defendant provides home health care services to patients throughout twenty-two U.S. states.

## III. JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, the proposed Class consists of more than 100 members, and at least one member of the proposed Class, including Plaintiff, is a citizen of a State different from Defendant.

17. This Court has personal jurisdiction over Defendant because Defendant conducts substantial and continuous business in the District of New Jersey, has purposefully availed itself of the privilege of conducting activities within this District, and a substantial part of the wrongful acts and omissions alleged in this Complaint occurred in this District. The exercise of personal jurisdiction over Defendant comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant is subject to personal jurisdiction in this District.

## IV. COMMON FACTUAL ALLEGATIONS

### *A. Bayada Collects a Significant Amount of Private Information.*

19. Plaintiff and Class Members are current and former patients and employees whose sensitive personal, financial, and medical information was collected, stored, and maintained by Bayada in the course of providing healthcare services.

20. In order to receive medical treatment and related services, Plaintiff and Class Members were required to provide Defendant with highly sensitive Private Information.

21. Upon information and belief, in the course of collecting Private Information from patients and employees, including Plaintiff, Defendant promised to provide confidentiality and adequate security for the data it collected from patients and employees through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

22. Because of the highly sensitive nature of the information it collects and stores, Defendant had a duty to safeguard patients' and employees' Private Information, comply with industry standards governing data security, adhere to all applicable federal and state privacy laws, use patients' and employees' information only for legitimate healthcare and administrative purposes, and promptly notify affected individuals if their information was accessed or disclosed without authorization.

23. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

24. The provision of Private Information by Plaintiff and Class Members was a necessary condition for receiving medical care and related services from Defendant.

23. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this information, which Defendant ultimately failed to do.

***B. The Data Breach.***

24. As set forth above, an unauthorized actor gained access to Defendant's network and copied data containing sensitive patient information, including the Private Information described above, between February 18 and March 2, 2026.

25. Upon information and belief, the Data Breach compromised Bayada patient and employee data, including Plaintiff's and Class Members' full names, addresses, social security numbers, insurance numbers, medical history, and diagnostic assessments.[4]

26. Upon information and belief, the unauthorized party accessed and acquired files in Bayada's systems containing unencrypted Private Information of Plaintiff and Class Members.

27. As such, Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

28. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of Private Information.

***C. Defendant Knew the Risks of Storing Valuable Private Information & the Foreseeable Harm to Victims.***

29. Defendant was aware that the Private Information it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

30. Bayada also knew that a breach of its systems—and exposure of the information stored therein—would result in the increased risk of identity theft and fraud (financial and medical) against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

---

[4] *Id.*

31. In recent years, numerous high-profile data breaches have occurred at businesses such as Equifax, Facebook, Yahoo, Marriott, Anthem as well as countless ones in the healthcare industry.

32. PII has considerable value and constitutes an enticing and well-known target to hackers, who can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[5]

33. PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.[6]

34. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities.

35. In 2024, breached healthcare records jumped by 64.1% from 2023's record-breaking total to 276,775,457 breached records, or 81.38% of the 2024 population of the United States.[7]

36. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years; for instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[8]

---

[5] *See* Brian Krebs, "The Value of a Hacked Company," KREBS ON SECURITY (July 14th, 2016) https://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited July 21, 2026).

[6] *See* Brian O'Connell, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.healthcarefacilitiestoday.com/posts/Healthcare-data-breach-What-to-know-about-them-and-what-to-do-after-one--18729 (last visited July 21, 2026).

[7] *Recent Health Care Data Breaches Highlight Importance of Proactive Leadership* , May 21, 2025, https://intruceptlabs.com/2025/05/recent-health-care-data-breaches-highlight-importance-of-proactive-leadership-skills/ (last visited July 21, 2026).

[8] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-

37. The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[9]

38. Additionally, healthcare providers "store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly – making the industry a growing target."[10]

39. Indeed, cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[11]

40. The healthcare sector suffered about 337 breaches in the first half of 2022 alone according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[12]

---

cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20__(last visited July 21, 2026).

[9] *9 Reasons Why Healthcare is the Biggest Target for Cyberattacks* https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited July 21, 2026).

[10] *Id.*

[11] *2022 2022 Breach Barometer*, https://web.archive.org/web/20240303060408/https://www.protenus.com/breach-barometer-report (last visited July 21, 2026).

[12] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year_(last visited July 21, 2026).

41. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Bayada's patients and employees especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud and more.

42. As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "[m]edical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[13]

43. A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market whereas stolen payment card information sells for about $1. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing

---

[13] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows* (May 14, 2025) https://www.idx.us/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited July 21, 2026).

> custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[14]

44. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

45. As technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

46. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

47. For these reasons, the Federal Trade Commission ("FTC") recommends that identity theft victims take several time-consuming steps to protect their personal and financial

[14] Brian O'Connell, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://ukenreport.com/healthcare-data-breach/ (last visited July 21, 2026).

information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[15] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

48. Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including medical identity theft, credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information.

49. For example, Social Security numbers, which on information and belief were compromised in the Data Breach, are among the worst kind of information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you

[15] *See* https://www.identitytheft.gov/Steps (last visited July 21, 2026).

> never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[16]

50. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

51. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[17]

52. There may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused.

53. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[18]

---

[16] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 21, 2026).

[17] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back* (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited July 21, 2026).

[18] *Report to Congressional Requesters, Personal Information* (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited July 21, 2026).

54. Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained Private Information about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

55. Based on the value of its patients' and employees' Private Information to cybercriminals, Bayada certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

***D. The Data Breach was Preventable.***

56. Bayada did not use reasonable security procedures and practices appropriate to the nature of the sensitive information Bayada collected from and maintained for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

57. The Data Breach was foreseeable and preventable. Defendant could have prevented or significantly mitigated the Data Breach by implementing reasonable and widely accepted data security practices, including properly encrypting or otherwise securing the systems, devices, and files containing Plaintiff's and Class Members' Private Information.

58. The Data Breach occurred as a result of Bayada's inadequate training and supervision of its IT and data security agents and employees, failure to implement reasonable security measures, and breach of its legal duties and obligations. Bayada permitted Plaintiff's and

Class Members' Private Information to be held in unencrypted form despite the heightened sensitivity of such Private Information.

59. To prevent and detect cyber-attacks or ransomware attacks, Bayada and its vendor(s) could and should have implemented numerous measures as recommended by the United States Government, including, but not limited to

- Implementing an awareness and training program.
- Enabling strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scanning all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configuring firewalls to block access to known malicious IP addresses.
- Setting anti-virus and anti-malware programs to conduct regular scans automatically.
- Managing the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.[19]

60. Given that Bayada collected and stored the highly sensitive Private Information of its current and former patients and employees, it had a duty to implement and maintain reasonable administrative, technical, and physical safeguards to protect that information from unauthorized access and cyberattacks.

61. The Data Breach demonstrates that Defendant failed to implement and/or properly maintain one or more reasonable security measures necessary to protect Plaintiff's and Class

---

[19] *How to Protect Your Networks from RANSOMWARE*, at 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited July 21, 2026).

Members' Private Information. As a result of these failures, unauthorized actors were able to access Defendant's systems and acquire Private Information belonging to thousands of patients and employees, including Plaintiff and Class Members.

### *E. Bayada is Obligated Under HIPAA to Safeguard Private Information.*

62. Bayada is required by HIPAA to safeguard patient PHI.

63. Bayada is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

64. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.306.

65. Further to 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

66. Under 45 C.F.R. 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

67. HIPAA requires Bayada to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against

reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, *et. seq*.

68. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to notify each affected individual of the Data Breach "without unreasonable delay and in no case later than 60 days following discovery of the breach."[20]

69. While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

70. As such, Bayada is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it acquires, receives, and collects, and Bayada is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties. This duty extends to any vendor selected by Bayada to be entrusted with the sensitive data of Plaintiff and Class Members.

71. Given the application of HIPAA to Bayada, and that Plaintiff and Class Members entrusted their PHI to Bayada in order to receive healthcare services, Plaintiff and Class Members reasonably expected that Bayada and its vendors would safeguard their highly sensitive information and keep their PHI confidential.

***F. FTC Guidelines Prohibit Bayada from Engaging in Unfair or Deceptive Acts or Practices.***

72. Bayada is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC

[20] *Breach Notification Rule*, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited July 21, 2026).

has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

73. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[21]

74. The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[22]

75. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[23]

76. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[21] *Start with Security – A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 21, 2026)

[22] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 21, 2026)

[23] *Id.*

77. Bayada failed to properly implement basic data security practices. Bayada's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

***G. Defendant Violated Industry Standards.***

78. Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Bayada, including, but not limited to: educating all employees; vetting all vendors; using strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Aas the Data Breach demonstrates, Bayada failed to follow these industry best practices, including a failure to implement multi-factor authentication and to properly vet its vendors.

79. Other best cybersecurity practices that are standard for healthcare entities include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

80. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

81. These foregoing frameworks are existing and applicable industry standards for healthcare entities, and upon information and belief, Bayada failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***H. The Monetary Value of Plaintiff's & Class Members' Private Information.***

82. As a result of Bayada's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information.

83. "Actors buying and selling Private Information from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[24]

84. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[25]

85. Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground Internet websites, commonly referred to as the dark web.

86. At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information

> The use of third-party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman

---

[24] Robert Lemos, *State-Sponsored Cyberattacks Target Medical Research*, *Dark Reading* (Aug. 22, 2019).

[25] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited July 21, 2026).

> [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.

87. Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[26]

88. The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[27]

89. Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[28] The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

90. This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim

---

[26] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy* (Feb. 28, 2011), https://www.wsj.com/articles/SB10001424052748703529004576160764037920274_(last visited July 21, 2026).

[27] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf_(last visited July 21, 2026).

[28] Angwin & Steel, *supra*, n. 26.

settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

91. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[29]

92. Here, where health insurance information was among the Private Information impacted in the Data Breach, Plaintiff's and Class Members' risk of suffering future medical identity theft is substantial.

93. Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft, including medical identity theft, have a crippling effect on individuals and detrimentally impact the economy as a whole.[30]

94. Bayada was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft (including medical identity theft) and fraud.

---

[29] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/ (last visited July 21, 2026).

[30] *Id.*

95. Upon information and good faith belief, had Bayada remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it would have prevented the cyberattack into its systems and, ultimately, the theft of the Private Information of patients and employees within its systems.

96. Based upon information and belief, the unauthorized parties have already utilized, and will continue to utilize, the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that can be misused.

***I. Plaintiff & Class Members Have Suffered Compensable Damages.***

97. Bayada's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways.

98. The risks associated with identity theft, including medical identity theft, are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

99. In order to mitigate against the risks of identity theft and fraud, Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

100. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or protected against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Bayada's conduct.

101. Plaintiff and Class Members now face a greater risk of identity theft, including medical and financial identity theft.

102. Plaintiff and Class Members are also at a continued risk because their information remains in Bayada's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Bayada fails to undertake the necessary and appropriate security and training measures to protect its patients' and employees' Private Information.

103. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

104. Plaintiff and Class Members also did not receive the full benefit of their bargain when paying for medical services. Instead, they received services of a diminished value to those described in their agreements with Bayada. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

105. Plaintiff and Class Members would not have obtained services from Bayada had they known that Bayada failed to properly train its employees and vet its vendors, lacked safety

controls over its computer network and software, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

106. Finally, in addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remain secure and is not subject to further misappropriation and theft.

## V. REPRESENTATIVE PLAINTIFF'S EXPERIENCE

107. Plaintiff Beaulieu was employed by Defendant Bayada from approximately November 2018 to March 2022.

108. As a condition of her employment with Bayada, Plaintiff was required to provide her Private Information, including her name, address, phone number, date of birth, Social Security number, and bank account information (including checking and savings account information), to Defendant.

109. Plaintiff is very careful about sharing her sensitive Private Information. She stores any documents containing PII or PHI in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. Plaintiff would not have entrusted her PII or PHI to Defendant had she known of Defendant's lax data security policies.

110. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff will spend significant time dealing with the Data Breach—valuable time she otherwise could spend on other activities.

111. Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; and (vi) the continued and increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's or its vendor's possession and is subject to further unauthorized disclosures so long as Defendant or its vendor fails to undertake appropriate and adequate measures to protect the Private Information.

112. Plaintiff additionally suffered actual injury in the form of her Private Information being disseminated, on information and belief, on the dark web as a result of the Data Breach.

113. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

114. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

115. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## VI. <u>CLASS ALLEGATIONS</u>

116. Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of herself and all other individuals who are similarly situated for the Class defined below.

117. The Class that Plaintiff seeks to represent (the "Class") is defined as follows:

All individuals whose Private Information was compromised in the Data Breach.

118. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families, all judges assigned to hear any aspect of this litigation, their immediate family members, and those individuals who make a timely and effective election to be excluded from this matter using the correct protocol for opting out.

119. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification.

120. Numerosity– Fed. R. Civ. P. 23(a)(1): The proposed class is so numerous that joinder of all members is impracticable. There are likely, at minimum, thousands of members of the Class. The exact size of the Class is ascertainable through Bayada's records.

121. Commonality– Fed. R. Civ. P. 23(a)(2): This action involves questions of law and fact common to the Class that predominate over any questions affecting solely individual members of the Class. Such common questions include but are not limited to

a. Whether Bayada had a duty to protect Plaintiff's and Class Members' Private Information;

b. Whether Bayada failed to adequately safeguard the Private Information of Plaintiff and Class Members;

c. Whether and when Bayada learned of the Data Breach;

d. Whether Bayada was negligent in collecting and storing Plaintiff's and Class Members' Private Information, and breached its duties thereby;

e. Whether Bayada failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f. Whether Bayada entered into an implied contract with Plaintiff and Class Members;

g. Whether Bayada breached that contract by failing to adequately safeguard Plaintiff's and Class Members' Private Information;

h. Whether Defendant was unjustly enriched;

i. Whether Plaintiff and Class Members are entitled to actual, statutory, or nominal damages as a result of Bayada's wrongful conduct; and

j. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

122. Typicality– Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of the members of the Class. The claims of Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class had all sought or received services from, or were employed by, Bayada, each having their Private Information exposed and accessed by an unauthorized third party.

123. Adequacy of Representation– Fed. R. Civ. P. 23(a)(4): Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation.

124. Superiority: Class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

125. Predominance: Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved.

126. Ascertainability: Class membership is defined using objective criteria and Class Members may be readily identified through Bayada's records.

127. Injunctive Relief: Bayada has acted or refused to act on grounds that apply generally to the Class, making injunctive and declaratory relief appropriate with respect to the Class.

## VII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
***(On Behalf of Plaintiff and the Class)***

128. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

129. Plaintiff brings this claim individually and on behalf of the Class.

130. Bayada owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in Bayada's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. This duty extended to any vendor selected by Bayada to be entrusted with the sensitive data of Plaintiff and Class Members.

131. Bayada's duty to use reasonable care arose from several sources, including, but not limited to, those described below.

132. Bayada had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Bayada. By collecting and storing valuable Private

Information that is routinely targeted by criminals for unauthorized access, Bayada was obligated to act with reasonable care to protect against these foreseeable threats.

133. Bayada's duty also arose from its position as a healthcare provider. Bayada holds itself out as a trusted provider of healthcare, and thereby assumes a duty to reasonably protect its patients' and employees' information. Indeed, Bayada was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach, as Bayada controlled the selection of vendors and the decision to entrust sensitive patient information to those vendors.

134. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. As a result of a successful attack that compromised Plaintiff's and Class Members' Private Information, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur:

a. mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of Private Information;

b. mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

c. failing to design and implement information safeguards to control these risks;

d. failing to adequately test and monitor the effectiveness of key controls, systems, and procedures;

e. failing to evaluate and adjust its information security requirements in light of the circumstances alleged herein;

f. failing to detect the breach at the time it began or within a reasonable time thereafter;

g. failing to follow its own privacy policies and practices published to their patients and employees regarding its oversight; and

h. failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

135. But for Bayada's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

136. As a direct and proximate result of Bayada's negligence, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their Private Information;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g. Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Bayada with the mutual understanding that Bayada would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their Private Information, which remains in Bayada's possession and is subject to further breaches so long as Bayada fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j. The diminished value of the services they paid for and received, and

k. Emotional distress from the unauthorized disclosure of Private Information to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

137. As a direct and proximate result of Bayada's negligence, Plaintiff and Class Members are entitled to damages, including compensatory or nominal damages, in an amount to be proven at trial.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff and the Class)***

138. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

139. Plaintiff brings this claim individually and on behalf of the Class.

140. When Plaintiff and Class Members provided their Private Information to Bayada, they entered into implied contracts with Bayada, under which Bayada agreed to take reasonable steps to protect Plaintiff's and Class Members' Private Information and comply with its statutory and common law duties to protect Plaintiff's and Class Members' Private Information.

141. Bayada required Plaintiff and Class Members to provide their Private Information as part of Bayada's provision of healthcare services. Plaintiff and Class Members accepted Bayada's offers and provided their Private Information to Bayada.

142. Implicit in the agreement between Plaintiff and Class Members and Bayada was Bayada's obligation to:

a. use such Private Information for business purposes only;

b. take reasonable steps to safeguard Plaintiff's and Class Members' Private Information;

c. prevent unauthorized access and disclosure of Plaintiff's and Class Members'

Private Information through proper monitoring and oversight;

d. promptly inform Plaintiff and Class Members of any and all unauthorized access and disclosure of their Private Information, whether through Bayada's systems or those of its vendors;

e. reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized access and disclosure at all points of collection, storage, and use; and

f. ensure that Plaintiff's and Class Members' Private Information is retained under conditions that kept such information secure and confidential by both Bayada and any third parties with whom Bayada shares such information.

143. The damages Plaintiff and Class Members sustained include, but are not limited to:

a. Theft of their Private Information;

b. Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their Private Information;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g. Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Bayada with the mutual understanding that Bayada would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their Private Information, which remains in Bayada's possession and is subject to further breaches so long as Bayada fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of Private Information to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

144. As a direct and proximate result of Bayada's breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, or nominal damages, in an amount to be proven at trial.

145. Plaintiff and Class Members are also entitled to injunctive relief requiring Bayada to (1) strengthen its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) provide and continue to provide adequate credit monitoring to Plaintiff and all Class Members.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
***(On Behalf of Plaintiff and the Class)***

146. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

147. Given the relationship between Bayada and Plaintiff and Class Members, where Bayada became guardian of Plaintiff's and Class Members' Private Information, Bayada became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class Members for the safeguarding of Plaintiff and Class Members' PII and PHI and to maintain complete and accurate records of what information Bayada stores.

148. Bayada has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Bayada's relationship with them—especially to secure their Private Information.

149. Because of the highly sensitive nature of the Private Information, Plaintiff and Class Members would not have entrusted Bayada, or anyone in Bayada's position, to retain their Private Information had they known the reality of Bayada's inadequate data security practices, such as Bayada's sharing Private Information with insufficiently secured third parties.

150. Bayada breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently protect Plaintiff's and Class Members' Private Information.

151. Bayada also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover and investigate the Data Breach in a reasonable and practicable period.

152. As a direct and proximate result of Bayada's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed supra).

## COUNT IV
### INVASION OF PRIVACY
***(On Behalf of Plaintiff and the Class)***

153. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

154. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

155. Bayada owed a duty to its current and former patients and employees, including Plaintiff and the Class, to keep this information confidential.

156. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' Private Information is highly offensive to a reasonable person.

157. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Bayada, but did so privately, with the intention that their information would be kept confidential and protected from

unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

158. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

159. Bayada acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices (including partnerships and data-sharing agreements with insufficiently secure third parties) were inadequate.

160. Acting with knowledge, Bayada knew or should have known that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

161. As a proximate result of Bayada's acts and omissions, the private and sensitive Private Information of Plaintiff and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

162. And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

163. Unless and until enjoined and restrained by order of this Court, Bayada's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Bayada with its inadequate cybersecurity system and policies.

164. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Bayada's continued possession of their sensitive and confidential records. A judgment for

monetary damages will not end Bayada's inability to safeguard the Private Information of Plaintiff and the Class.

165. In addition to injunctive relief, Plaintiff, on behalf of herself and the other Class Members, also seeks compensatory damages for Bayada's invasion of privacy, which includes the value of the privacy interest invaded by Bayada, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## COUNT V
### UNJUST ENRICHMENT
***(On Behalf of Plaintiff and the Class)***

166. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein, and pleads the following count in the alternative.

167. Plaintiff brings this claim individually and on behalf of the Class.

168. Upon information and belief, Bayada funded its data security measures and data-sharing agreements from its general revenue including payments made by or on behalf of Plaintiff and Class Members, or services provided by them to Defendant.

169. As such, a portion of the value of services provided to Defendant and/or payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Bayada.

170. Plaintiff and Class Members conferred a monetary benefit on Bayada. Specifically, they purchased healthcare services from Bayada or provided Bayada with employment services, and in so doing provided Bayada with their Private Information.

171. In exchange, Plaintiff and Class Members should have received from Bayada the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

172. Bayada knew that Plaintiff and Class Members conferred a benefit which Bayada accepted. Bayada profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

173. In particular, Bayada enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Bayada instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures.

174. Under the principles of equity and good conscience, Bayada should not be permitted to retain the money belonging to Plaintiff and Class Members because Bayada failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

175. Bayada failed to secure Plaintiff and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members conferred upon Bayada.

176. Bayada acquired Plaintiff's and Class Members' Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

177. If Plaintiff and Class Members knew that Bayada had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Bayada.

178. Plaintiff and Class Members have no adequate remedy at law.

179. As a direct and proximate result of Bayada's conduct, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their Private Information;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g. Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Bayada with the mutual understanding that Bayada would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their Private Information, which remains in Bayada's possession and is subject to further breaches so long as Bayada fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of Private Information to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

180. As a direct and proximate result of Bayada's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

181. Bayada should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Bayada should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Bayada's services.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Colleen Beaulieu, on behalf of herself and other Class Members, prays for judgment against Defendant Bayada and respectfully requests that the Court issue an Order:

A. Certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B. Awarding equitable relief enjoining Bayada from engaging in the wrongful conduct complained of herein pertaining to the misuse and disclosure of the Private Information of Plaintiff and Class Members;

C. Awarding injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D. Awarding all damages available at equity or law, including, but not limited to, actual, consequential, statutory, and nominal damages in an amount to be determined;

E. Awarding attorneys' fees, costs, and litigation expenses, as allowed by law;

F. Awarding prejudgment interest on all amounts awarded; and

G. Awarding all such other and further relief as this Court may deem just and proper.

*s/Martin P. Schrama*
By: Martin P. Schrama, Esq.

**STARK & STARK, P.C.**
100 American Metro Boulevard
Hamilton, New Jersey 08619
Tel: (609) 896-9060
Fax: (609) 895-7395
Martin P. Schrama, Esq.
Stefanie Colella-Walsh, Esq.
Email: mschrama@stark-stark.com
scolellawalsh@stark-stark.com

*s/Elena A. Belov*
By: Elena A. Belov, Esq.

**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Floor
New York, New York 10023
Tel: (917) 716-7132
Elena A. Belov, Esq.*
Email: elena@almeidalawgroup.com
*pro hac vice forthcoming

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the *Federal Rules of Civil Procedure*, Plaintiffs demand a jury trial as to all issues and defenses.

*s/Martin P. Schrama*
By: Martin P. Schrama, Esq.

**STARK & STARK, P.C.**
100 American Metro Boulevard
Hamilton, New Jersey 08619
Tel: (609) 896-9060
Fax: (609) 895-7395
Martin P. Schrama, Esq.
Stefanie Colella-Walsh, Esq.
Email: mschrama@stark-stark.com
scolellawalsh@stark-stark.com

*s/Elena A. Belov*
By: Elena A. Belov, Esq.

**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Floor
New York, New York 10023
Tel: (917) 716-7132
Elena A. Belov, Esq.*
Email: elena@almeidalawgroup.com
*pro hac vice forthcoming

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, it is hereby stated that the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative

proceeding, to the best of our knowledge and belief.

*s/Martin P. Schrama*
By: Martin P. Schrama, Esq.

**STARK & STARK, P.C.**
100 American Metro Boulevard
Hamilton, New Jersey 08619
Tel: (609) 896-9060
Fax: (609) 895-7395
Martin P. Schrama, Esq.
Stefanie Colella-Walsh, Esq.
Email: mschrama@stark-stark.com
scolellawalsh@stark-stark.com

*s/Elena A. Belov*
By: Elena A. Belov, Esq.

**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Floor
New York, New York 10023
Tel: (917) 716-7132
Elena A. Belov, Esq.*
Email: elena@almeidalawgroup.com
*pro hac vice forthcoming